The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Be seated. I want to welcome everyone to the Fourth Circuit's Court of Appeals this morning. We have three interesting cases and lots of good lawyers. And we're going to start with United States v. Smith. Mr. Rayfield. May it please the Court, Mike Rayfield for the appellant, Aghee Smith. Mr. Rayfield, you're here all the way from New York. I am. Thank you for having me. Yes, sir. Good to have you with us. Thank you. We've raised two issues in our briefs, and unless the Court has a different preference, I'm going to start with the argument that the defendants were denied their right to a public trial. The public trial issue really boils down to this. In a case where the public is correctly barred from the physical courtroom, is the public's ability to see the jury more important than the cost of installing a single jury-facing camera? And I'd submit to you that if you agree with the way I just framed the question, the answer isn't all that difficult. So do you say there's a closure here? Yes. What kind of closure? Well, in two respects. One is that the physical courtroom was closed to the entire public, and two was that the public had no way of seeing the jury. They used three courtrooms. Three courtrooms? There were three courtrooms used. Right, but the- They all explained in footnote four of Judge Jackson's opinion, or memorandum order, whatever he called it. He laid it out there, but there were three courtrooms used, and he explained how that was working out. Well, but the trial was happening in one courtroom, and the public was barred from being in the courtroom where the trial was actually happening. Well, they were using the public seating area for the jury because of the COVID pandemic. Sure. I mean, they were trying to deal with all that. I mean, and Judge Jackson, I thought, was very careful in writing everything down and considering the authorities and doing everything he could to comply with the Sixth Amendment. Well, I would respectfully- But you also claim that there was some violation with the Fifth Amendment, I think. Back then, nobody ever understood what he was talking about, I don't think. But it's a Sixth Amendment issue, right? Yes. Well, so the pandemic, it was certainly important to the analysis, and so we certainly agree that the risks of COVID created an overriding interest that justified the court from excluding the public from the physical courtroom. But under the Supreme Court's decision in Waller- Now, which part of this are all- How many parts of this thing are you claiming violated the Constitution? I'm sorry, how many parts- How many parts of Judge Jackson's ruling? One aspect of it, the aspect of the refusal to allow a single jury-facing camera that would allow the public to see the jury. And that's critical, because the ability to see the jury isn't just part of the Sixth Amendment, right? It's the most critical component. The Supreme Court and this Court have said over and over that the public's presence keeps a defendant's, quote, "'triers' keep keenly alive to a sense of their responsibility and ensures that jurors will perform their respective functions more responsibly.'" So if Judge Jackson had ordered an additional camera installed so that the public could see the jury as well as everybody else, this argument would go away? Precisely. That was all we were asking for below. Our request was extremely modest. Can I ask, are you aware- I was not able to find any, but maybe you were. Are you aware of any case where a court has said, in a situation where we concede that keeping people out of the physical courtroom is okay, and in a case where there was video, admittedly not the video you wanted, not the full video, but there was video, are you aware of any case where any federal court has ever said that violated the public trial right? I'm not aware of any federal case, but we've cited a Minnesota Supreme Court case, State v. Bell, in our briefs. And there, interestingly, this was sort of a more aggressive position than we were taking. The Supreme Court there held that even a one-way video feed to the jury wasn't enough. They were requiring a two-way video feed, because they said the one-way feed didn't ensure that the people in the courtroom would understand that they're being observed. Let me just ask you the other thing that I find potentially very troubling about the possibility of- if we accepted your argument, do you have any rough back-of-the-envelope guesstimate of how many criminal trials were conducted in violation of the Constitution during the pandemic? It seems like it's probably a staggering number. I honestly don't know. I mean, there have been probably, I think we've cited in our briefs- Certainly every single trial in the Norfolk Courthouse of the Eastern District of Virginia. As far as I know, this is the only case where this juror visibility issue has been raised. For example, the cases we cite in our briefs in the Second Circuit, Fifth Circuit, Tenth Circuit, the defendants simply didn't, for whatever reason, didn't raise the issue of this public- of this jury-facing camera. This is the only case where that- Do we think it's the denial of a public trial? No, I guess that it is subject to harmless error analysis and forfeiture and all of those things. I'm sorry, what was your question? No, I was musing aloud about whether I thought this sort of thing was structural error, but you agree that this is subject to harmless error? No, this is structural. Okay, so every single trial in the Norfolk Courthouse had a structural constitutional error? Has structural error- well, if there was no camera facing the jury- But there wasn't of any trial that was held in the Norfolk Courthouse, as far as I can tell. Unfortunately, that might not be true. I don't know that any other defendant has raised this issue. But if it's structural, like we're off to the races, there's no prejudice requirement. You're done. Well, I think structural error- forgive me if I'm misunderstanding. Structural error means that there's no requirement to show prejudice, but it still has to be preserved, otherwise it's subject to plain error review that affects the defendant's substantial rights. I'm not sure about the interplay between structural error and- So there'd be a different standard of review if they hadn't preserved it. Right, exactly. Historically, where defendants are dangerous, like the mob cases and things, courts have closed the courtroom. I mean, they've concealed the identity of the jurors for their protection. I think they're doing it in New York. There's five trials going on up there right now. Jurors have not- their faces have not been shown. Well, but the public is being allowed inside the courtroom. Well, they've got people in the courtroom doing different things, but they're doing what there's a lot of precautions made. But they have also concealed the faces of jurors, historically, to protect them. Dangerous defendants, like the- And the public. And the public. But I think when they blew up the World Trade Center the first time, they tried some terrorists up there and took precautions. There are certainly cases where- But you would say maybe they didn't challenge them, saying, well, you are. I don't know. I suspect they did. They're a good lawyer. Each case has to be subject to its own Waller analysis. Pardon? Each case has to be subject to its own balancing test under Waller. And here, there's only two interests to be balanced against each other, the defendant's interest in public observation of the jury and the cost of installing a single jury-facing camera. And that cost, by the way, isn't even related to the health interest. So why do you say it's just the cost of a camera? I took it, maybe not written out explicitly, but from Judge Jackson's opinion that it wasn't just, well, we've got to go to IT storage and get another camera. We're going to have to do a lot of reconfiguration work to make this work, and it just was more involved than would meet the eye if you just picked out a spare camera. Tell us why that's not sufficient. Well, two reasons. First of all, as the Ninth Circuit explained in Allen, if the court declines to take an alternative measure, it has to find that that measure would, quote, fail to achieve the government's interests, not simply that the chosen route is less costly. That rationale, the difficulties of creating a new system or adding a camera, have nothing to do with the public health interest that government advanced in support of the closure. Second, I think that the cost is simply, I mean, there were two ways to do this. One is to add a camera and a new camera angle to a feed that already had fairly sophisticated camera angles to an overflow courtroom, to an overflow monitor that was very large, 50 inches, 60-inch screen, and it would have been a fairly easy process. Neither the district court nor the government, which did not object to this request, ever said that this was too costly to be justified. Another option would have just simply have been to add another camera and another monitor to the overflow courtroom, so you wouldn't have to actually change the video feed at all. Can I ask you just one? I think there's a lot to be said of, like, in a situation where the defense wants some view of the jury and the government doesn't want, doesn't object. I take your point that there does not seem to be any super compelling reason to not do this here. Can I ask you, though, how would you deal with the, but it's not a good, like, my only concern with, well, not my only, but one concern with recognizing this sort of right is it strikes me that there are immediate series of follow-ons, like the view is not good enough or I can't see all the jurors or some of them are obstructed somewhat or I can only see two of them. How would you have courts fashion a rule that says you have to give some view of the jury without creating a world in which every single defendant gets to be like, well, but they didn't have a good enough view of the jury? How would you do that doctrinally? Yeah, I mean, you would do it using the Supreme Court's test in Waller. You would say, is the additional measure, you know, does the measure that the defendant is asking for. But that's never going to work because the problem at the micro level is every defendant will say, you just should have done this one thing, and this one thing would have cost almost nothing and it would have made things marginally better, which means the cost-benefit calculus always goes in the defendant's favor. I don't think it would. I think, for example, if you said, you know, all we're saying needs to be done is to roughly approximate the live experience. Whoa, that's really? A 50-inch screen is roughly approximating the live experience? Well, I'm sorry. It's roughly approximating the live experience of seeing the jury in a case where the public is already being excluded from the courtroom. I'm saying if in, you know, this has been the trials have been conducted in this way using the Waller analysis for, you know, 100 years, and all you would need to do is just apply the Waller analysis. If we were asking for- Waller was a complete closure. Okay. Waller was a complete closure. Waller actually was a more limited closure than ours because it was only a pretrial here. But that's what's right. Waller, with respect, strikes me as completely different because Waller is about a complete closure of part of the proceeding. And the question then is, Waller's test makes a lot of sense to me in that context where we're saying, well, if you've got to close some of the proceeding, how much should you close? You're like, well, I don't know. Figure out the reason you have to close it and close absolutely no more than you need to close. If there's classified information or an extremely vulnerable victim, like just that part, that seems amenable to the do no more than you have to do. But this is a categorically different kind of thing. This is like the whole thing is closed to some extent, and how are we going to deal with that? This just strikes me as a very different kind of question, and this question strikes me as much more dangerous in terms of you could always do a little better, you could always do a little better, you could always do a little better. I think that that's fair. We were asking for the most modest thing possible. All you have to do is decide in this case whether the single addition of a jury-facing camera is more important than the public's ability to observe the jury. That's the only question before the court in this case. There may be other cases where a defendant says, I want five different camera angles, and the court says, no. One camera angle approximates the live experience. It's enough for you to basically see what the jury is doing, see how they're reacting to the testimony, see if they're awake. And in that case, you wouldn't have to do that one extra thing. Can I take you to the Confrontation Clause issue for a sec? Sure. Could you give me your best response to why it's not harmless? Let's posit, obviously solely for the sake of argument, that we conclude there was a Confrontation Clause violation. Sure. So I think my best response is the government has cited no case where the entire testimony of three accusing witnesses was found harmless beyond reasonable doubt. These aren't just any old witnesses. These are people accusing Smith of crimes. And I haven't found any case where such a thing was deemed harmless. This isn't an addition of a document or an exhibit or anything like that. So how many other witnesses appeared on the behest of the government to testify other than the three who testified by deposition? I don't know the exact number. My colleague will probably know the number. I think it's at least nine witnesses. Does that make a difference in this case? Because it seems like there were several of them who testified in person and they did not paint a very good picture of the defendants. Sure, but what these defendants were saying were qualitatively different from what the other witnesses were saying. Didn't they comply with Rule 15? I'm sorry? Didn't they comply with Rule 15 for deposition? There was nothing wrong with the depositions. Did they comply with Rule 15? Yes. Do you think Rule 15 is unconstitutional? That's your position? No, our position is that a deposition can't be used if a witness is available. The judge ruled, I thought he ruled they weren't available. I'm sorry? I thought Judge Jackson ruled they were not available. Correct. He ruled the witnesses were not available. Yes, sir. They could use the deposition. So if they're not available, the government could use the deposition under Rule 15. Well, right. If the witnesses aren't available. Correct. So they had a deposition and you could examine the witnesses during the deposition. They were right across examination. But under the Confrontation Clause, if the witness is available, which is what we say. Well, you say the judge ruled erroneously. Yes. In saying that the witnesses were not available. Right. So that's a ruling that we would review for use of discretion. Correct? No, the ultimate Confrontation Clause question is for you to know. He ruled that the witness was unavailable. The witness had been examined by both sides. And there was a transcript, a record of what the witness said. And the question was whether that information could be provided to the jury. Isn't that about what happened? No, the judge found that they were not available because of various concerns about COVID and health and family related concerns. Your argument is basically that there wasn't enough effort or evidence from the government. Yes. Our principle argument is that it's almost undisputed that the government made no efforts, let alone good faith efforts, to produce the three witnesses at issue. The government doesn't contend that they ever served any of the witnesses with a subpoena, which is the bare minimum use of the power of the court to compel their presence. I just want to get one more point about harmless error. Your time's up. You know you're cutting into your time, but you can use part of your rebuttal time if you want to. Okay. I just want to make one more point, which is that the government obviously thought these three witnesses were important because of the lengths that it went to depose them and because it mentioned them 30 times. And you were involved in the deposition. I'm sorry? And you all had a right to go to the deposition. Yes. Okay. I'll reserve the remainder of my time.  Ms. Yushi? Thank you. Just sort of out of curiosity, why, for instance, wasn't there a two-way video feed during the trial with those three witnesses? That would seem like it would be a fairly simple way to handle it. Your Honor, we did not believe that that would actually constitute, that would be sufficient under the confrontation clause. There are case law where the defendant was not in the room with the particular victims or witnesses, and it was found that that was not sufficient under the confrontation clause. So we felt that an in-person, that Mr. Smith and his attorney were there for, was much safer under the confrontation clause. And then we looked again to make sure that they were, and ensured that they were unavailable once we got to trial, Your Honor. So we felt that the Rule 15 deposition was... Well, I mean, the harmless error may solve the question here, but were there any affidavits from the witnesses' physicians or something like that to the effect that there were medical reasons they would be unavailable? No, Your Honor. One of the case agents that went with me to Sacramento to meet with the people did the affidavits both times for the court, who met the people in person, saw their family situations involving their spouses, saw the two of them couldn't even make it to the deposition and had to be driven by agents. And so he himself made the affidavit for the court to support our unavailability. Can I ask you, you say something in your brief that just I bounced off. You say they were legally and factually unavailable at page 44 of your brief. I will say this as respectfully as I can. I have literally no idea what that means. The court, well, I think it goes to kind of the different levels of review that this court can look at, but the court decided that based on the fact that they were legally... I don't know what that means. What does that mean? Factually, that both, that there was no way that we were going to be able to get them there for court. But that seems... That was factual. Can I ask you, I guess the problem is it seems like we jumped from is it impossible to get them there, which I'll just posit is my hypothesis of what the Confrontation Clause actually requires, and is it a really bad idea to get them there? And it seems to me that what the government argued and what the district court accepted is it's a really bad idea and there are really good reasons to not get them there. And let me posit that I think those are true, right? But I guess I'm just not so aware of authority that says if it's a really bad idea, the witness is unavailable. Your Honor, I think that it was an unacceptable risk and that the court found that it was an unacceptable... What is your best case for the proposition that that makes someone unavailable under the Confrontation Clause? Your Honor, I believe that just as... Because it looks very different, for example, than Ohio v. Roberts. In Ohio v. Roberts, the government really, really tried hard to find them and get them there, and it failed, right? And, you know, obvious reasons. The person's dead, the person's in Brazil, the person is hiding out from the marshals, the person has ignored five subpoenas. Those, to me, are like classic unavailability situations. It just seems like a really bad idea. Your Honor, I don't think there is a case directly on point at all, because this is unprecedented times of COVID-19. All of these... The three witnesses were in the elderly... Well, lots of people came to court as witnesses during COVID. It seems like to me the sticking point in this case is that each of these three witnesses had some physical or medical detriment, which may have been true. And the problem seems to me is that there isn't any evidentiary proof that the degree of that difficulty made it a danger to them to travel, because there wasn't any verifying evidence. I'm not sure a postal inspector's observation is enough in that circumstance. I understand that, Your Honor, but regardless, and to jump to the harmless error point, I think that if there was, and we don't believe there was any constitutional infirmity by admitting those depositions, we do think it was harmless. While they were sympathetic... I just have a whole bunch more questions about unavailability before we get to harmlessness. Are you aware of a single case where a court has said that it was futile for the government to subpoena a person who was alive? I know Robert says the law does not require doing pointless acts. You don't have to issue a subpoena for a dead person. Do you know of a case where a court has said it's acceptable to not even try to subpoena someone who's alive? No, Your Honor, but if I can explain... And you agree the criminal rules have no geographical limitation, right? So, like, if it was a civil case, like, people are like, I'm in California. I'm not going to Virginia. You can't make me go to Virginia. The criminal rules have no limitation like that, right? Correct, Your Honor, and inside the United States. However, in this particular case, there was no way that we were going to get a material witness warrant if they did not show up. There's no way that a court of law was going to find them in contempt for refusing to get on a seven-hour flight. No, but what Ohio v. Roberts says is, look, many citizens feel a sense of civic responsibility, and it's one thing to tell a postal inspector that you'd really prefer not to go to Norfolk. It's another thing to decide you're going to ignore a subpoena. Like, some people who might say, would you pretty please do it, will say no, and if they get an order saying they have to do it, will say yes. There are some number of people for whom that's true. There are some number. There's another number, Your Honor, who completely... No doubt, no doubt. Yes, and in this situation... Or in that circumstance, they would then be compelled or the government would be compelled to get a physician's sworn affidavit that to make this trip places their life in danger or something to that effect. That sort of seems to me like the big missing gap here. And, Your Honor, the government felt, and I think it's clear from this, from based on the combination of factors, the COVID factor, everyone could get a physician to say it's not safe for them to come. However, with the other factors combined and the fact that in one of the defendant's own filings, they give a National Institute of Health bulletin that says over 78% of those deaths by COVID were people 65 and over. I mean, that is a very compelling argument. Were all these witnesses over 65? Two of them. One was 64, Your Honor. By the time trial came, he may have been 65. I'm not sure. You could have made a lot better record. I think in hindsight, Your Honor, everyone can make a better record. In foresight, you could have made a lot better record. Wouldn't that be hindsight? We felt that at that time that this was sufficient to show. You must have thought that you needed the evidence pretty bad. Well, Your Honor, we thought it was important and we thought that these were important. And that undermines your harmless error report. Well, we also had to have the evidence. Your Honor, there were 17 victims that testified live, or testified other than these three victims that we're talking about here. And that was based on the entire conspiracy, which was two of the six counts that Mr. Smith was convicted of. Our opposing counsel says in his brief that the three absent witnesses testifying via deposition said some things that the others did not say. I each had their own story, but the theme of every single witness and the nine others that were direct victims of Mr. Smith, and they were all consistent with that they trusted him, that he lied about the longevity and the success of the investments, that he used religion and his church with many of them to gain their trust, that there was little to no risk, that they were going to get quick returns. And he was doing this over a period of years, knowing that the first person he sold this to never got anything because they all complained to him and they were all consistent with that, and to the last person where he says this is still a great investment. I want to give you a chance to respond to what I think are the three biggest problems for you on harmless error. One is sort of the atmospheric. You've got the case you've got, but thing one, the government thought it was important enough to have these people testify, to do something, look, you're all smart people, that at minimum you had to know, had confrontation clause risks, but you did it anyway. Thing two, there's the point that your friend on the other side says that he's not aware of any cases where a court has said a witness's entire testimony that accuses the defendant of criminal conduct is harmless. Three witnesses took the stand and they weren't corroborating witnesses, they weren't like small fact detail witnesses, they're like that man committed a crime against me. And thing three is the fact that all three of these people were mentioned in the government's closing argument, and not like in a glancing way. All three of these people were meaningfully discussed in the government's closing argument. I guess those collectively strike me as the hardest three facts for harmless error, and I wanted to give you a chance to respond to that. Your Honor, the cases that the defendants have cited, usually from what I recall are that particular witness was either the sole witness accusing the defendant or one of the actual main witnesses. There was nothing of this sort in a five-week trial where over 30 witnesses were given. But have you cited anywhere a court said the entire testimony of a witness who accused the defendant of criminality was harmless error? No, Your Honor, I don't believe we have. But again, I think that factually they're very distinctive. That we had, as I said, 20 witnesses minus the three, so 17 witnesses, nine other ones, live testimony against Mr. Smith that talked about the same things, and it was cumulative. And the government is... So the government took a risk of getting a reversal and a confrontation clause to prevent three witnesses that were cumulative and didn't really add anything? Your Honor, we do believe that without them we would have had the same. We absolutely believe we would have had the same. You went to a lot of effort to get three people that you think were irrelevant to your ability to get a guilty verdict. Your Honor, there were other depositions that were in the... We did this for at least five or six different witnesses. These are just the three that Mr. Smith... were personal against Mr. Smith. So we did go through a lot to make sure because a lot of these, we weren't sure if some of these people were going to be able to show up, and so we did do depositions. One of them in the earlier iteration of the Daryl Bain case, she was unavailable for his case, but she was available and able to travel for this one. So we did have a deposition in that case as well. Now, do we review the availability ruling for abuse of discretion or not? I believe you do, Your Honor. There's a clear error in terms of the facts that were decided by Judge Jackson. What case says that? So your friend on the other side has a footnote in his brief that says this court has never squarely held. So, I mean, here's the problem. We've said factual findings are reviewed for clear error. We've said violations of the Confrontation Clause are reviewed de novo. I guess, Threshold, do you agree that we have never squarely addressed what the standard of review of a determination of unavailability is? I do, Your Honor. But I think that based on… But evidentiary issues are reviewed for abuse of discretion. Absolutely, Your Honor. That's just a general principle. Yes, Your Honor. Is this a mixed question in your view? Part fact, part law? Absolutely, Your Honor. And I think, again… So, for example, the question, a living person to show unavailability. That is a pure question of law, right? I think, and no one has ever said they have to. I know, but something like that would be a pure… Or I guess the other question is, it's not that they're unavailable in a classic sense. It would just be a really bad idea for them to come, which, again, I'm going to posit is true. Is that sufficient to show unavailability? That's a legal question. Would you agree that's a legal question? Yes, Your Honor. But based on the situation that Judge Jackson was dealing with at this time, with the rise of the Omicron variant, and the situation that these individual, he made case-specific, witness-specific findings based on the information before him. And we do believe that some deference should be made to Judge Jackson at that time. I guess I'm just thinking that, like, off a whole variety of topics in CrimPro over the last 25 years, the Supreme Court has said these mixed questions are always reviewed de novo. Whether you're in Miranda custody is de novo. Whether a search is reasonable is de novo. Whether Terry Stott was just… And there's all of these. There's arguments that we should defer to district court judges, but the Supreme Court says over and over again, de novo, de novo, de novo, de novo. I think there's a place for all of those standards, Your Honor. Obviously, a constitutional question like this is reviewed de novo. But the facts below that have a different standard. Can I turn you to the video question? My biggest hesitation with the government's argument, I'll just say, your threshold argument is this isn't a closure at all. And my biggest hesitation about that is, I'll say this, do you believe that where we are now in the state of the world, including the fact that we're all having this conversation in person, do you believe a district court judge could do this exact same thing today, right now in the state of the world as it currently exists? And the reason I say that is because the government's argument that there's no closure here at all would suggest that district court judges can livestream every single trial in perpetuity with no constitutional restrictions whatsoever. And I guess I'm going to start by just admitting I am skeptical that that is true. But why isn't the logical implication of the government's argument that the district court could be doing this today? I believe the court could. Really? Well, I mean, with the same facts. No, no, today. No, today, as in vaccines are widely available. Almost everything in society is happening. But if the government's view is this isn't a closure at all, the Constitution doesn't have anything to say about this, and a district court could literally kick members of the public out of the courtroom in perpetuity. Well, Your Honor, a quick part of it. There's several trials, including probably the one going on in New York, that have overflow rooms. And so they are videoing and live-feeding. But all of those trials that I'm aware of have at least a handful of seats for members of the general public. I realize a lot more people want to see those trials than can, but, like, I think in all of those trials that I'm aware of, there are at least a handful of seats in the courtroom for members of the general public. And I'm sure that's true, Your Honor. However, I think we'd be here regardless of the situation if, well, could the court do it again for the right reasons? I believe they could right now. No, I mean, could the court just decide, you know what, having members of the public in the physical courtroom poses unacceptable security risks. They might disrupt the proceeding. It's just easier. No members of the general public in any courtroom will just live-stream all of them. You don't think that, like, the government's first-order argument suggests that that would be immune from constitutional scrutiny, and that strikes me as implausible. Your Honor, I think there has to be a basis for it. And I think every decision— No, but if the Constitution doesn't regulate this at all, there literally doesn't have to be a basis for it. The court could just do it because it wanted to. Well, I don't think the court ever has a decision that this court can't review for some sort of reason, whether it be for abuse of discretion or whatever the argument is. It seems like to me your answer would be, in response to Judge Hyten's, yes, you're probably right, but COVID made all the difference. I do believe that, Your Honor. I don't know why you'd want to go any farther than that. I agree, Your Honor. I do think that this was a unique situation, and COVID did make all the difference in this situation. But we still believe it was not a constitutional closure. But we do believe that even under the Waller factors, if they did apply, that Judge Jackson did narrowly tailor it and made it reasonable accommodations for what he was dealing with. But how? I mean, first of all, the government didn't oppose doing this. I realize you were probably in a difficult position, fully admit that. I suspect the reason you didn't oppose it was because— But what I read the district court to say, or at least there's a way to read the district. It's like, we've been doing this in all the other trials. That seems annoying. No. I mean, there's a way to read the district court that that's basically what it said. And that—I mean, if—this is the problem, because if we're not under the Waller factors, I think you can do this in every trial, and that strikes me as problematic. But if we are under the Waller factors, I don't know how the district court, when faced with a joint proposal or an effectively unopposed proposal, can just say, not. And like, not—I've looked into it. It would be really expensive. The IT people tell me it would be really hard. The district court just says, no. Well, the district court did talk about the extensive retrofitting of the courtroom. And if you look at the pictures, and I'm not sure if you've ever been in this particular courtroom in Norfolk, it's the largest courtroom that we have in Norfolk. But it's very long, and it's much more narrow than it is wide. And so the three cameras, and you look in the sealed joint appendix, are on the one side of the wall. And those are three different cameras just to get the jury, the attorneys, and the judge on video. And the assumption that only one single camera would have covered this entire thing is just not correct. And if it did, it would have been a blurry mess, and you wouldn't have been able to see anyone, and we'd still be here. So, you know, I think there's a lot of assumptions in the fact that one single camera would have fixed it, because I don't believe for this particular defendant it would have. I guess it probably would have been better if the district court judge had said those things as opposed to you representing at oral argument those things. Well, like I said, you can look at the pictures of the courtroom and look at that, and you can see the three cameras just to get close-ups of these, of the particular quadrants that were being shown to the public in that particular case. And so the judge did go through. He, I think a lot of the reference was to the district court's standing order about what they have done, why they have done it. You're talking about the standing order that's described and put those four on base seven. Yes, Your Honor. Yes, Your Honor. And that went into effect on March 18th, 2021, and it was ineffective at the time of this trial. It was, Your Honor. Correct. It was the Omicron variant had geared up again, and so things were back to almost square one. Can you remember, there are at least two other courthouses in this district. Do you have any proper about what they were doing in the other two courthouses in this district during the same time period? I'm not sure, Your Honor. I know that I think the Norfolk courthouse was the busiest. I was in three different five-week trials during COVID plus other trials. I'm not sure what the other ones were doing, Your Honor. Luckily, I did not have to go to trial. If there are any other questions, Your Honors, if not, I will stand on my papers. General order went into effect in March of 21, and this trial was what, February 22? Yes, sir. Were there any amendments or changes, fine-tuning in that 10 or 11-month period or anything? I do believe that the court gave a lot of discretion to the district court judges that were dealing with their own trials. Like Judge Jackson, he did look at this specifically, and he did consider alternatives such as allowing public in the back. The general order came from the? The chief judge. The chief judge? Yes, sir. Judge Davis? Yes, sir. He was also in the Norfolk courthouse. We do believe that if at all, if it was a closure, that it was a partial closure and that that held up to scrutiny as well as the harmless error standard should apply in this case. Thank you, Your Honor. Thank you. Thank you very much. Mr. Rayfield? Thank you, Your Honors. So, three points. One is that the government's argument that this would have been a blurry mess if we had just added the single courtroom camera. Judge Heitens, I think you correctly addressed that argument. That was not in the district court's order. It was not the position that the government took below. Neither the government nor the district court said that this would be somehow infeasible. And the burden was on the government and the district court to make findings that this alternative measure was not justified. Second? Did you drive a case? No. Yeah. Were you there during the trial? I was not. No, I'm new here. Second, on the question of the standard of review for unavailability, I think the court has said that the general standard for unavailability is de novo. And like Judge Heitens, you mentioned the court has not clearly addressed whether findings underlying a determination of unavailability are mixed questions of law or findings of fact. Well, some of them clearly would be findings of fact, right? If the district court said, made a finding of fact, the government issues a subpoena, the recipient of the subpoena said, heck no, I won't. I mean, that's a finding of historical fact, right? And that would be clear error. Findings of historical fact, I absolutely agree. But what I think at minimum should be at least a mixed question of law, in fact, that's reviewed de novo, is the question of whether the government's efforts were constitutionally sufficient. The questions of whether evidence is admissible or not is reviewed for abuse of discretion. That is not the standard. That's the standard for evidence rulings generally. Now, you can prove or establish an abuse of discretion by trying to show that the court made a legal error or a factual error. That goes into the determination of whether the property exercises discretion. But deciding on the admissibility or non-admissibility of a piece of evidence is reviewed for abuse of discretion. Respectfully, that's not the standard that the court has applied. Well, that's the law, as I understand it. And I've tried hundreds of cases. And I've reviewed a lot of them here. Fair enough, Your Honor. I'm just saying that the court has applied different standards in the context of a constitutional confrontation. We may be talking past one another, but abuse of discretion is what governs evidence rulings. And courts can make little errors in analyzing those things, factual errors, or you can claim they can, and get to the abuse of discretion that way. Fair enough. I think you're right that I was misunderstanding. And I think how I would respond to that is that, yes, this would be a legal error that would constitute an abuse of discretion. I think one of you was going to ask me. A legal error can prove or establish abuse of discretion. The court didn't understand the facts or found the wrong facts. But when it comes down to the final determination of whether to admit the piece of evidence or not admit the piece of evidence. I'm good. Okay. And lastly, I just wanted to, I think, I wrote it down because one thing that the government said in her response just now is that she conceded that the testimony of the three witnesses was important. Those were her words. And I would submit that. Well, it was all important to them. If it wasn't important, they wouldn't have offered it. Right, but if it's. Yeah, I agree with that. I mean, that's what we've talked about that. That hurts their clear harmless error contention. I think it's dispositive on the harmless error. Their argument is you don't get to harmless error, I'm sure. But if you get to it, then it was harmless. But the fact that they wanted to use the evidence sort of undercuts the harmless error contention. Right. I think it's irreconcilable with the position that this was harmless beyond a reasonable depth. And unless the court has any other questions, I thank you so much for hearing from me. Thank you very much. We appreciate it. Good to have you here. Thank you. Appreciate your work. And we'll come down and greet counsel and then proceed to the next case.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens